The next case we have is Thompson v. Secretary of State for the State of Alabama. We will hear first from Ms. Lange. Good morning, Your Honors, and may it please the Court, my name is Danielle Lange. I represent the Plaintiff Appellants in this matter. This is a case about whether Alabama can enforce a felony disenfranchisement scheme that, one, maintains an intentionally discriminatory standard of moral turpitude that the Supreme Court had already held was intentionally discriminatory just ten years prior when it was reintroduced into the law, whether Alabama can disenfranchise citizens based on the retroactive application of a 2017 law in violation of the ex post facto clause, and whether or not Alabama can do so without even notifying people with felony convictions of their eligibility criteria to vote when they register to vote on the state's voter registration form. Because the district court misapplied the motion for summary judgment standard, weighed all the evidence, and made all of the inferences in favor of the state, and erred as a matter of law with respect to the ex post facto clause and the NVRA claims, this Court should reverse. Beginning with the motion for summary judgment standard, this Court should be guided by the 11th Circuit's decision in the Georgia State Conference of NAACP v. Fayette case, which is very similar here. There, the Court said that the district court might have ultimately come to the same conclusion on the law. There, it was about a vote denial claim under the totality of the circumstances. Also, a very fact-intensive claim, similar to the fact intensity of an intentional discrimination claim. The district court may have ultimately come to the same conclusion, but it could not do so at the motion for summary judgment stage because that determination ultimately turned on weighing of evidence, finding one party's evidence more persuasive than the other's, making credibility determinations about the experts, and you see exactly the same activity in the district court's reasoning below on the intentional discrimination claim. There's a core factual dispute here that is material and very much in dispute about whether or not the moral turpitude standard itself was the crux of the intentional discrimination in the 1901 Constitution. While I think the 1901 Constitution and its criminal disenfranchisement provision was intentionally discriminatory, there is a factual dispute as to whether or not the moral turpitude standard was specifically infected with intentional discrimination. And the experts that the plaintiffs put forward were quite clear that it plainly was the crux of intentional discrimination. In fact, you see newspaper accounts saying registrars are going to be left to determine, it's uncomfortable to even say this, whether or not appropriating a ripe watermelon or fried chicken is a crime of moral turpitude. It was the breathtaking latitude that was given to the registrars that was the crux of intentional discrimination. In fact, defendant's expert quoted John Knox, who was the chairman of the 1901 Constitution, saying that if applied correctly, the criminal disenfranchisement provision would disenfranchise more African Americans than white people because registrars were given that type of discretion. Yet, the district court repeatedly held that the moral turpitude standard itself was race neutral. And I can point you to several pages where the district court said so, and I think that is a reversible error in and of itself. On page 27, the court said the use of the phrase moral turpitude does not on its own show discriminatory intent. On page 32, the court said the evidence of the kind of nebulousness of moral turpitude, quote, without more, is not probative of racially discriminatory intent. But of course, there was more, and the district court did not once reference Dr. Reiser's report, which had all of the evidence I just reviewed. And finally, on page 34, the district court referred to the moral turpitude standard as, quote, race neutral. That is a disputed fact that could not be determined on the motion for summary judgment standard and was central to the district court's finding and requires reversal. I'd like to move on to discuss the ex post facto clause, because there the district court also made factual findings that it could not make at the motion for summary judgment standard, but also applied the wrong legal standard. The district court correctly found that felony disenfranchisement is, as a matter of law in the 11th Circuit, a question of punishment. And the 11th Circuit has held that at least three times, twice on Bonk, in Johnson, in Jones 1, and in Jones 2. And it is also undisputed that the 2017 law is being applied retroactively to plaintiffs and other individuals in Alabama whose convictions predate the 2017 law. And so the only question is whether or not there was fair warning based on the prior nebulous moral turpitude standard that was not defined. There was no fair warning. The moral turpitude standard violated both the fair and warning prongs of the ex post facto clause. The district court found otherwise based on decades old state court decisions based on a different statute that was defunct at the time of plaintiff's crimes. The district court held that because there were state court decisions defining moral turpitude in the character impeachment context, which actually included misdemeanors, showing that it plainly is not the same standard as the criminal disenfranchisement standard, was sufficient to provide fair warning. But that is the wrong legal standard. Under the ex post facto clause, the Supreme Court has been abundantly clear that you don't look at the individual circumstances that might mitigate an ex post facto clause violation, but rather you look at the standard of punishment. But moreover, the district court found fair warning by making, again, an erroneous factual finding at the motion for summary judgment stage. On page 41, she stated that there was unrefuted evidence that the state officials considered those Alabama decisions to be a source of the definition of moral turpitude for purposes of the disenfranchisement provision and that no evidence before the court which contradicts that this case law was relied upon in the context of state officials applying of the disenfranchisement provision. That is an incorrect statement of the evidence and could only have been reached through an evidence. In fact, there was evidence from state election officials saying that, in fact, there was no authoritative guidance, that these state law cases were merely guidance, that it was guidance that the registrars were free to reject and, in fact, often did reject, and that registrars often came to differing conclusions. In fact, there is evidence in the record of Perrion Roberts, an individual who was convicted of a drug crime in one location was found to be disenfranchised under the moral turpitude provision, moved to a different county and was permitted to vote or may have been flipped. But in any event, based on different registrars coming to different conclusions, it was plainly an error at the motion for summary judgment stage to say that state officials were always following the state court decisions when the evidence from state election officials is to the contrary and, in fact, there was a legislative enactment in 2017 that said there was no authoritative guidance to individuals with felony convictions or to election officials prior to the passage of the 2017 law. While the court should not delve into the individual's circumstances, the district court's application of the ex post facto standard as to the individual's circumstances of Plaintiffs Thompson and Gamble is also erroneous. In fact, Plaintiff Gamble was convicted of a statutory crime of drug trafficking that has never been held by an Alabama state court to be one that is involving moral turpitude. The use of the phrase trafficking was used colloquially in one state court decision, but as we know, the colloquial term of drug trafficking and the actual statutory definition in Alabama are quite different. Statutory definition does not require any proof of intent for resale. And with respect to Plaintiff Thompson, the court relied on a case from 1984 called Stolman that was about a misdemeanor and whether or not that misdemeanor would be considered one involving moral turpitude and that was expressly excluded from an attorney general opinion the year later that was determining which felonies would involve moral turpitude. Certainly, if the attorney general had no fair warning that theft was a crime of moral turpitude, then neither did Plaintiff Thompson. Finally, with respect to the NVRA claim, I would posit that the case law is quite clear, that specified means to state explicitly or in detail, and the district court's finding that saying that you must not have a disqualifying conviction rather than saying what those disqualifying convictions are fails to specify in any meaningful way what that eligibility criteria is. Thank you. Thank you. You've reserved some time for rebuttal? Yes. We'll hear from Mr. LaCour. Thank you, Your Honor. May it please the court, Edmund LaCour on behalf of the, I apologize. It's the first time I've used the little glove. All right. We're all learning new things in these last couple of years. Feel free. May it please the court, Edmund LaCour on behalf of the Secretary of State of Alabama. I'll turn first to the intentional racial discrimination. Could you speak up a little? There you go. Sorry. I'll turn first to the intentional racial discrimination claim and most specifically what you did not hear from my friend on the other side, which was any discussion of the intent of the 1995 legislature or the 1996 voters who overwhelmingly approved Amendment 579 with support of black and white legislators and black and white voters alike, including a majority of majority black counties in the state. And the critical inquiry for the intentional racial discrimination claim is intent of the people who put the words into law. That was made clear both in the Johnson decision from this court in 2005 and then more recently in Abbott v. Perez, a 2018 decision from the United States Supreme Court that you will not find anywhere in my friend's opening or reply brief before this court. What the Abbott court said was that the 2013 Texas legislature was not obligated to show that it had cured the unlawful intent that the lower court had attributed to an earlier legislature there, the 2011 legislature. Likewise, the 1996 Alabama legislature and its voters were not required to make any such showing. Same is true if you look to the Johnson decision from 2005. Judge Barquette wrote a solo dissent there that argued that the 1968 Florida legislature needed to make some affirmative showing when it was putting in place a new felon disenfranchisement provision in its constitution that it had recognized the racism of the 1868 felon disenfranchisement provision and that it was moving forward for some non-discriminatory reason. But every other member of this en banc court rejected that approach and said that because there was no evidence of malintent for the 1968 Florida legislature that the equal protection claim against that 1968 provision failed. The same is true here and the cases could hardly be more similar. We have a 1901 provision that was intentionally racially discriminatory but then a new provision in 1996 that wholesale repealed Section 182 and replaced it with something that was different. It was narrower in scope and again, no evidence that this was done for reasons of intentionally racially discriminatory. Can I ask you a question? What is the purpose of the new version of the statute, the 2017 one? The 2017 statute, Your Honor? Yes. It's designed to provide greater clarity in defining felonies involving moral turpitude to give effect to Section 177, the 1996 provision. All right. What do you understand to be the purpose of not allowing those with convictions for crimes of moral turpitude to be? The purpose, Your Honor, well, going back to 1884 when Alabama Supreme Court in the Washington decision said it was basically to ensure that only those people who had not broken faith with the political community through some important felony are allowed to shape what the laws are going to be in our state and who's going to enforce them and who's going to interpret them. So here's my question. You've gone back to 1884 to explain that even though it was later reenacted and we're talking about the later reenaction, which is a different statute, it still is going to the idea of getting rid of, well, of not allowing people who have crimes of moral turpitude to vote. And if the purpose is, I guess, I mean, I guess as you've said, then I wonder why felonies such as bribery of public servants, perjury, deceiving an elector in preparation of their ballot, altering another person's ballot, failing to count legally cast absentee votes, and voting more than once in an election and willfully and intentionally signing the name of another elector in a poll book would not fall into those, into that category of moral turpitude. First, Your Honor, I'm not certain if every one of those is a felony as opposed to a misdemeanor. If any of them were misdemeanors, of course, the 1996 provision no longer disenfranchises anyone for any misdemeanor. So that would explain at least part of that. More broadly, I mean, the legislature need not perfectly pursue its ends. The fit needs to be reasonable, but it could always be closer, I suppose. It's likely never going to be perfect. So I think it does still accomplish that goal. It found many serious felonies, including murder and burglary and first-degree theft, like some of the plaintiffs have been convicted of in this case, and decided that those are serious breaks in breaking faith in political communities such that they shouldn't be the ones who are deciding what the laws are going to be going forward. And so I understand what you're saying, and I agree with you. It doesn't have to be perfect. But is it possible that that might reflect some kind of intent if the purpose is to not allow those who break political faith with the community to vote, and we're allowing those who have felonies related to voting fraud to continue to vote? Is that – maybe there's some other provision that prohibits them from voting that I'm not aware of. That could be the case. I don't know. Is there? No, Your Honor. But to the extent we're talking about what the legislature did in 2017, I don't think that really has a lot of bearing on what the intent was of the legislators and the voters in 1995 and 1996. Except to the extent that if the whole purpose stems back to the 1800s, and the 2017 statute identifies specific crimes, I guess, that are crimes of moral turpitude, and they don't include felonies relating to voting fraud, I mean, that just strikes me as perhaps a little odd, if they're not accounted for in some other way. And in other words, why wouldn't that reflect in some way on what the intent of the legislature might have been? I think maybe we had some evidence that it was overwhelmingly white voters engaged in those crimes that might reflect some racially discriminatory intent, but I'm not aware of any evidence to that effect in the record or any allegation being made by the plaintiffs to that effect. All right. So, because there's, I just want to make sure I understand, there's no evidence that you're aware of, at least in this record, that, I guess, that white voters engaged overwhelmingly in voting fraud? That's my understanding, Your Honor, and there's certainly not evidence that those crimes were selected. Fair enough. I guess that's the purpose of going after black voters as opposed to white voters, or leaving white voters untouched. Thank you. I'd like to turn to the ex post facto argument. Section 177 is the suffrage and elections provision of the Alabama Constitution, and it is not punitive. Someone's conviction status is one of several non-punitive voter qualifications listed in that provision alongside age, citizenship, residency, voter registration status, and mental competence. Now, Section 177 doesn't punish the 16-year-old or the mentally incompetent when they're not allowed to exercise a right to vote. But, counsel, doesn't Title 17 also address criminal offenses? Your Honor, I was talking about Section 177 in particular in the Constitution, which does not. And I was saying, like the qualifications related to age and residency, we're not punishing someone for being from Georgia when we don't allow them to vote, and we're not punishing someone simply because they've committed a felony that is disqualifying under Section 177. I think one fact that is very relevant for that is that if someone commits their crime out of state or if they rob a federal bank and go to jail and federal prison for many years, they are also disenfranchised. And, of course, the state has no interest nor any power to punish anyone for a federal crime. But if the Unabomber were to get out of the federal penitentiary tomorrow and move to Alabama, we would still have a strong interest in making sure that he's not selecting our legislators, our prosecutors, or our judges. It's a similar reason why, following the Civil War, you see in the 14th Amendment, express recognition that there will be potentially disenfranchisement for people who participated in rebellion or other crimes. Now, that rebellion was something that was in the past. It was the Civil War. And Congress made the wise judgment that perhaps the freedmen should have more of a say over how the country and the state were going to be governed going forward than Jefferson Davis or other rebels who had broken faith with the political community. It's a similar rationale that Alabama has recognized for its felon disenfranchisement provisions going back more than 100 years. Counsel, what do we do with Johnson, and Jones for that matter, but particularly Johnson? I mean, it seems like we're bound by Johnson that this is a criminal or a punitive kind of, anytime that there's a disenfranchisement, that there is a punitive effect of it. And it's a punitive provision. At least two answers there, Your Honor. The first is this Court has never considered whether a felon disenfranchisement law is punishment when interpreting the ex post facto clause, which is a different analysis that, of course, looks first to legislative intent. And if the law is situated as a civil provision, it requires the clearest proof, a very high standard, to counteract what the legislature has deemed to be doing. And then second, in Johnson and in both Jones decisions, you're dealing with Florida's disenfranchisement law. We've never considered Alabama's disenfranchisement law. And again, legislative intent is critical here. So the intent of the Alabama legislature would be the key. And even if Florida, which pushed very vigorously in the Jones litigation, the idea that they were punishing for punishment's sake, could be said to have a disenfranchisement law that punishes, we still have to look at Alabama's law in the first instance. I agree that we do. We've got to look at the specific law that we're considering. Excuse me. Here, it doesn't seem, would you agree that there's no specific statement as to whether this is intended to be a civil statute or a criminal punishment? That's correct, Your Honor, but that's also not uncommon. I agree with you. But that's the first step, right? We look at that. We're in agreement. We can't tell one way or the other. There's no express statement. So then we've said in Johnson, felon disenfranchisement laws are unlike other voting qualifications. These laws are deeply rooted in this nation's history and are a punitive device stemming from criminal law. Don't we have to consider that in some way? And how does that, how does that figure into the analysis? Surely you're not suggesting we totally disregard that. It's certainly not completely irrelevant, Your Honor, but I'd also point you to the non-punitive reasons that Florida had advanced and that the court relied on in ultimately rejecting the challenge to, that was brought in the Jones case. And we have advanced these non-punitive purposes, but only two other courts of appeals that I'm aware of that have considered whether a felon disenfranchisement law is punitive or not for purposes of the ex post facto clause are the First Circuit and the Sixth Circuit. And they have both said that these are civil. I believe the Sixth Circuit and Seventh said that as a matter of federal law, felon disenfranchisement laws are, do not violate the ex post facto clause. Of course, you've got TROP FIDELIS. And while DICTA, this court seriously considers the DICTA of the Supreme Court. And there, the U.S. Supreme Court said that disenfranchisement laws designate a reasonable ground of eligibility for voting and are sustained as a non-penal exercise of the power to regulate the franchise. So I think the court also has to seriously take that into account in considering why Alabama has Section 177 in its constitution. Briefly, I'd like to turn to the vagueness challenge more generally, which of course, Jordan v. DeGeorge, it's a 1951 decision of the United States Supreme Court that rejected the notion that the phrase crime involving moral turpitude was unconstitutionally vague. That remains good law even after Johnson and DiMaia. As the DiMaia court said, many perfectly constitutional statutes use imprecise terms. The problem with Johnson and DiMaia was not that there was serious potential risk or substantial risk baked into that statute. The problem was that you had courts having to imagine an ordinary case and you had no idea how a judge was going to imagine what the ordinary case of burglary might look like. So you had sort of indeterminacy stacked upon indeterminacy. But what Johnson recognized as well was that it's not uncommon for there to be dispute over whether a somewhat general standard might apply to any given case. The problem was courts didn't even know how to conduct the inquiry at all. So counsel, I think that's accurate. But I'm understanding your friend's argument over there to be that it's not necessarily the language so much as the language in conjunction with the registrar's discretion. I don't know if you wanted to address that. Your Honor, it's not uncommon with any legal language for there to be some dispute between one fact finder and another, one reader of the law and another. When it comes to the registrar's discretion, they're sort of the first line but they're by no means the last. Anyone who disagrees with the registrar's determination as to whether or not their crime involves small turpitude can take that to the probate court, up to the circuit court and up to the Alabama Supreme Court even. I don't believe any of the individual plaintiffs who remain in this case took advantage of those procedures but it hardly renders this phrase which has been reaffirmed by the United States, which has been affirmed by the United States Supreme Court to be unconstitutionally vague. Thank you, counsel. Thank you. All right, Ms. Lang. Thank you, Your Honors. I'd like to start with the issues around the ex post facto clause and the issue of punishment. I think that the Supreme Court has kind of disposed of the only evidence that my friend on the other side refers to as to why we should consider this civil, which is its location. There is no evidence and there's no evidence that the state points to that there was a civil purpose. As Judge Rosenbaum said, there's no kind of expressed statement by the legislature and so instead the only reliance by the state is on its presence in the kind of elections code instead of in the area related to criminal law. But the Supreme Court has said that location and labels of the statutory provision do not transform a civil remedy into a criminal one or vice versa and that a penalty cannot be converted into a non-penal measure by so naming it. We must ascribe to the particular statute the character disclosed by its purpose operation regardless of name. Given that, the evidence that's actually in the record and that's outlined in our reply brief on page 16 is that state officials understood this to be punishment. So the state cannot get past step one under Mendoza-Martinez. And if you were to look at the factors as we explain in our reply brief, they also all cut in favor of finding it to be punishment. Nothing in Johnson was specific to the Florida statute in particular but rather a finding that felony disenfranchisement is punitive. Perhaps in a similar way to Mendoza-Martinez where the Supreme Court found that the stripping of citizenship rights was in fact punitive. When it comes to a few cases that were referenced by the state, I just want to refer to them. Simmons and Bredesen are the two ex post facto cases related to felony disenfranchisement the state lies upon. They are of course out of state, out of circuit precedent that cannot overcome this court's precedent that felony disenfranchisement is punitive but they also don't help the state. Simmons was a case that was specifically about disenfranchisement during incarceration and the court was clear that it didn't find that to be sufficiently punitive but rather had different civil purposes. Bredesen was a case about whether or not a rights restoration provision, not a felony disenfranchisement provision, was punitive and the court said, looked to that as part of its analysis. The court's reliance on TROP v. Dulles is similarly unavailing. TROP's dicta was just that, it was dicta. Since then in Richardson v. Ramirez the court has referred to felony disenfranchisement as punitive and if you look at what TROP cited for the position that felony disenfranchisement is not punitive but rather civil, you can see why it's outdated and no longer persuasive. It cited two cases about how bigamists, regardless of conviction, should not be allowed the privilege to vote. That is no longer the way that our Supreme Court interprets the right to vote. It is not a privilege, it is a right. And cases like Carrington v. Rash make clear that any civil purpose that's aimed at kind of weeding out which voters we like or don't like is no longer proper. And the only constitutional reason for felony disenfranchisement is punitive. It is one of largely a retribution in a sense that these individuals have lost their right to vote. With respect to the reliance on Jordan v. DeGeorge, the state repeatedly leaves out the key part of Jordan v. DeGeorge, which held that moral turpitude was not big, at least as applied to crimes that involve fraud as an element. That is not the case for plaintiffs, is not the case for most of the felony convictions involved in the 2017 list. In fact, the 2017 list expressly excludes, as Judge Rosenbaum pointed out, a lot of the convictions that you would consider to be quintessentially involving moral turpitude under that reading and the reading of the defendant's expert, which said that things like bribery or perjury would be quintessential moral turpitude claims. Counsel, can I ask you a question? Yes. Is there a process by which a person with a conviction of a crime of moral turpitude can get his or her voting rights back or civil rights? Yes, there is, Your Honor. There is a process. Who makes that determination as to whether they can get their rights back? And do you know what the standards are for making that determination? Yes, Your Honor. The Board of Pardons and Paroles, there is a provision that is mandatory that if you meet certain qualifications, you are entitled to get your rights to vote back if you apply. For those who do not meet that criteria, it is entirely discretionary and the Board of Pardons and Paroles has complete discretion. So our clients do not qualify under the kind of mandatory rights restoration provision and so they are entirely at the whims of the Board of Pardons and Paroles. I believe both Plaintiff Thompson and Gamble at least have applied and have not had their rights restored. Thank you, Counsel. All right. Thank you very much from both sides. Nice argument on both sides. All right. Whatever you want to do. I'm good. I'm good. Okay. Do you need food? I'm good to go. All right. Good job. All right. The next case we have is...